Steven **OLIVEIRA**, Plaintiff,

v.

**QUARTET MERGER CORP.** and **Pangaea Logistics Solutions Ltd.**, Defendants.

No. 14–cv–9411 (JSR).

United States District Court, S.D. New York.

Signed Sept. 7, 2015.

---

on Quartet's proposed merger with defendant Pangaea Logistics Solutions Ltd. ("Pangaea"). Plaintiff Steven Oliveira, a shareholder in Quartet, voted against the merger, and he also checked a box to indicate that he wished to exercise his right, embodied in Quartet's Amended Certificate of Incorporation (the "Amended Certificate"), to convert his shares to cash if the merger were consummated. Oliveira failed, however, to follow the Proxy's instruction to deliver his shares to Quartet prior to the shareholder meeting on the vote, and defendants subsequently rejected his conversion demand. The question presented in the instant cross motions for summary judgment is whether the Amended Certificate, which imposes no so-called "delivery requirement" on the exercise of conversion rights, or the Proxy, which did so require, governs Oliveira's entitlement to convert his shares to cash. Under the circumstances here, where the terms of the Proxy are not incorporated into the Amended Certificate and no other contractual document defines shareholders' conversion rights, the Court concludes that the Amended Certificate alone controls and enters summary judgment for Oliveira.

The following facts are undisputed. Quartet, a Delaware corporation, was formed as a special purpose acquisition company in April of 2013 for the purpose of entering into a merger, asset acquisition, or similar "business combination." Defendants' Statement of Undisputed Material Facts ("Defs.' 56.1 St."), ECF Dkt. No. 19, ¶¶ 1, 3. On October 28, 2013, Quartet filed its Amended Certificate. *Id.* ¶ 30. The Amended Certificate, in paragraph C of section six, provides that, in the event that shareholders approve a proposed business combination,

any holder of a share of Common Stock sold in the IPO ("IPO Shares") who

Eugene R. Licker, Sara Jessica Crisafulli, Loeb & Loeb LLP, Martin Oliver Cabrera Fojas, Virginia & Ambinder, LLP, New York, NY, for Plaintiff.

Edward H. Pomeranz, Caryn L. Marcus, Graubard Miller, New York, NY, for Defendants.

JED S. RAKOFF, District Judge.

On September 2, 2014, defendant Quartet Merger Corp. ("Quartet") distributed a Joint Proxy Statement/Prospectus Supplement (the "Proxy") for a shareholder vote

voted on the proposal to approve such Business Combination, ... whether such holder voted in favor or against such Business Combination ..., may, contemporaneously with such vote, demand that the Corporation convert his IPO Shares into cash. If so demanded, the Corporation shall, promptly after consummation of the Business Combination ..., convert such shares into cash ....

Affidavit of Caryn L. Marcus in Support of Defendants' Motion for Summary Judgment ("Marcus Aff."), ECF Dkt. No. 20, Ex. D ("Amended Certificate"), at 3. In paragraph F of the same section, the Amended Certificate states that a holder of IPO shares shall be entitled to receive distributions from a trust holding Quartet's cash in only two circumstances: "in the event ... he demands conversion of his shares in accordance with paragraph C above in connection with any Proxy Solicitation" or in the event Quartet fails to consummate a business combination within the time period provided for in the Amended Certificate. *Id.* at 4.

On the same day that Quartet filed the Amended Certificate, the SEC deemed Quartet's Form S–1 Registration Statement effective and Quartet became a publicly traded company on NASDAQ. *Id.* ¶¶ 2, 20. In connection with its IPO, Quartet's underwriter sent Oliveira and others Quartet's final prospectus (the "Prospectus"). *Id.* ¶ 19. The Prospectus, reflecting the terms of the Amended Certificate, explained that any proposed business combination required shareholder approval and that, "[i]n connection with any stockholder meeting called to approve an initial business combination, any public holder of shares of common stock voting either in favor of or against such proposed business combination will be entitled to demand

that his shares of common stock be converted for" cash. *Id.* ¶ 21. Separately, the Prospectus stated that Quartet "may also require public stockholders who wish to convert [to cash] ... [to] tender their certificates ... at any time through the vote on the business combination" and that the "proxy solicitation materials that [Quartet would] furnish ... in connection with the vote ... [would] indicate whether [Quartet] [was] requiring stockholders to satisfy such delivery requirements." *Id.* ¶ 27. On October 31, 2013, Oliveira purchased 175,000 units of Quartet at a price of $10 per unit.[1] *Id.* ¶ 29.

At the end of April 2014, Quartet issued a press release announcing that it had entered into a merger agreement with Pangaea. *Id.* ¶ 40. As mentioned above, on September 2, 2014, Quartet distributed the Proxy in connection with the vote on the proposed merger. *Id.* ¶ 71. The Proxy stated that:

To properly exercise your conversion rights, you must (a) affirmatively vote "FOR" or "AGAINST" [the proposed merger], (b) demand that Quartet convert your shares into cash no later than the close of the vote at the meeting by marking the "I Hereby Exercise My Conversion Rights" box below or submitting a demand in writing to Quartet's secretary, and (c) deliver your stock to Quartet's transfer agent prior to the meeting.... If you properly exercise your conversion rights and the mergers are completed, then you will be exchanging your shares of Quartet common stock for cash and will no longer own these shares.

Marcus Aff., Ex. P (Proxy), at OLIV0001201.[2] Oliveira voted against the merger and checked the box to exercise his conversion rights, but he failed to deliv-

---

1. "Units" comprised both "common stock," which could be converted to cash, and "rights," the details of which are not relevant here. Defs.' 56.1 St. ¶ 9.

2. In the period between the April press re-

er his shares. Defs.' 56.1 St. ¶¶ 75–77.[3] On October 2, 2014, Pangaea announced that the merger had successfully closed. *Id.* ¶ 79. A week later, on October 9, Oliveira wrote to defendants requesting that they honor his written exercise of his conversion rights. *See* Affidavit of David Sgro in Support of Defendants' Motion for Summary Judgment and in Opposition to Plaintiff's Motion for Summary Judgment ("Pl.'s 56.1 Statement"), ECF Dkt. No. 28, Ex. V. Had Quartet done so, Oliveira would have received approximately $10.20 per share for a total of $1,785,000. *See* Local Rule 56.1 Statement of Material Undisputed Facts in Support of Plaintiff's Motion for Summary Judgment, ECF Dkt. No. 24, ¶ 17. However, defendants, citing Oliveira's failure to deliver his shares prior to the shareholder meeting on the vote, refused to convert the shares and instead exchanged Oliveira's Quartet shares for Pangaea shares. *See id.* ¶ 18; Defendants' Responses to Plaintiff's Rule 56.1 Statement, ECF Dkt. No. 27, ¶ 16. The price of Pangaea shares declined following the merger, and over the next several months, Oliveira sold his shares on the open market for a total of $937,439.59, or $847,560.41 less than he would have received had his shares been converted to cash at the time of the vote. *See* Pl.'s 56.1 Statement ¶ 20.

■ Oliveira now alleges that defendants breached their obligations under the Amended Certificate when they refused to honor his conversion demand and are liable for the difference between the amount

Oliveira would have received had his demand been honored and the amount for which he sold his then-Pangaea shares. The Court agrees. Delaware law (applicable here) treats the certificate of incorporation as a contract between the corporation and its shareholders, *see Airgas, Inc. v. Air Products & Chemicals, Inc.*, 8 A.3d 1182, 1188 (Del.2010), and Quartet's Amended Certificate unambiguously imposes only two requirements on shareholders seeking to exercise their conversion rights. Specifically, paragraph C of section six provides that if a shareholder (1) votes on a proposed business combination and (2) contemporaneously "demand[s]" conversion, then "the Corporation *shall,* promptly after consummation of the Business Combination . . ., convert such shares to cash." *See* Amended Certificate at 3 (emphasis added). Confirming this, paragraph F of the same section explains that a shareholder "*shall* be entitled" to the cash held in Quartet's trust in the event that there is a proxy vote and the shareholder "demands conversion . . . *in accordance with paragraph C.*" *Id.* at 4 (emphasis added).

■ The term "demand," on its face, does not include a delivery requirement. *See Rhone–Poulenc Basic Chemicals Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del.1992) ("Courts will not torture contractual terms to impart ambiguity where ordinary meaning leaves no room for uncertainty."). But even assuming, *arguendo,* that "demand" could somehow be

---

lease and the September vote, Quartet issued a number of other documents that also instructed shareholders that, to exercise their conversion rights, they would have to deliver their shares in addition to voting and making a demand. *See, e.g.,* Defs.' 56.1 Statement ¶¶ 61–62, 68–69.

**3.** There is no dispute that Oliveira, an experienced investor, received the documents stating that shareholders wishing to convert their

shares to cash would have to tender their shares, but he maintains, and Quartet does not dispute, that he did not actually read the portions of these documents articulating the "delivery requirement." *See, e.g.,* Defs.' 56.1 ¶¶ 18, 28, 36. For that matter, he did not read most of the documents here relevant. But since the issue is one of breach of contract, his failure to read is neither here nor there.

interpreted to include a delivery requirement in some contexts, here, the extrinsic evidence confirms that, as used by Quartet, "demand" is distinct from "delivery." The Proxy itself distinguishes between the demand and delivery requirements by marking the former as requirement "(b)" and the latter as requirement "(c)" (with voting as requirement "(a)"). *See* Proxy at OLIV0001201. Further, the Prospectus states that a shareholder "will be entitled to *demand*" conversion but "may *also* [be] require[d] . . . [to] *tender their certificates.*" Defs.' 56.1 St. ¶¶ 21, 27 (emphasis added). Other documents distinguished between the two requirements as well. *See, e.g.,* Marcus Aff., Ex. G, August 13, 2014 Press Release ("Demand may be made by checking the box on the proxy card . . . . A holder exercising his conversion rights must tender his stock certificate . . . ."). In light of this consistent separate treatment, it is clear that the Amended Certificate imposes no delivery requirement.

Thus, when Oliveira both voted on the proposed merger and contemporaneously demanded that defendants convert his shares to cash, he triggered defendants' obligation under the Amended Certificate to "promptly" convert his shares to cash. *See* Amended Certificate at 3. Allowing defendants to impose a delivery requirement through the terms of the Proxy would, in effect, authorize a de facto amendment of the Amended Certificate, a result at odds both with Delaware law governing the procedures for amending certificates of incorporation, *see* Del.Code Ann. tit. 8, § 242(b), and with general contract principles prohibiting unilateral modifications of the contract, *cf. Cont'l Ins. Co. v. Rutledge & Co.,* 750 A.2d 1219, 1230 (Del.Ch.2000). It follows that defendants' refusal to honor Oliveira's demand because he failed to satisfy the additional delivery "requirement" articulated in the Proxy constituted a breach of the Amended Certificate for which defendants are now liable.

Defendants raise three primary arguments opposing this straightforward result. They first assert that the "how, when and where concerning the demand can only be ascertained from the Prospectus and Proxy materials." Memorandum of Law in Support of Defendants' Motion for Summary Judgment ("Defs.' Moving Br."), ECF Dkt. No. 21, at 22. This may be true, but it only gets defendants so far. The Proxy states that a shareholder, to exercise his conversion rights, must "demand that Quartet convert [his] shares into cash . . . by marking the 'I Hereby Exercise My Conversion Rights' box below or submitting a demand in writing to Quartet's secretary." Proxy at OLIV0001201. Oliveira, therefore, complied with the "how, when and where" of the "demand" as expressed in the Proxy. It would be different—and would raise different issues that the Court need not confront, *see* Del.Code Ann. tit. 8, § 151(a)—if the Proxy stated that a shareholder must make a demand "by delivering his shares" so as to, in essence, replace a demand requirement with a delivery requirement, but that is not what occurred here.

Defendants next argue that the "law is clear that contemporaneous documents concerning the same subject matter should be read together as one contract" and urge the Court, once more, to consult the Proxy and the Prospectus. *See* Defs.' Moving Br. at 18–19 (citing, among other cases, *Comerica Bank v. Global Payments Direct, Inc.,* No. CIV.A. 9707, 2014 WL 3567610, at 7 (Del.Ch. July 21, 2014)). As Oliveira is quick to observe, most of the cases on which defendants rely actually stand for the proposition "that contemporaneous contracts," not merely contemporaneous "documents," should be read together as a single contract. *See Comerica*

*Bank,* 2014 WL 3567610, at \*7. Thus, because defendants do not argue that the Proxy is a contract and because, as discussed below, the Prospectus is not, as relevant here, contractually binding, these cases do not support defendants' invocation of the terms of the Proxy and Prospectus. The remainder of the cases to which defendants direct the Court are no more on point, as they illustrate the separate, but equally inapposite rule that where a contract incorporates the terms of another document by reference, that other document may define the parties' rights. *See, e.g., Ruffalo v. Transtech Service Partners Inc.* No. CIV.A. 5039, 2010 WL 3307487, at \*12 (Del.Ch. Aug. 23, 2010) (considering a corporation's registration statement (which contained the corporation's prospectus) when "[t]he Charter provide[d] that [the corporation] 'shall be entitled to withdraw interest income from the Trust Fund *as specified in the Registration Statement* '") (emphasis added). Here, the Amended Certificate does not incorporate any terms pertaining to conversion rights from either the Prospectus or the Proxy.[4]

Finally, defendants argue that the Prospectus constitutes a contractual offer that, upon Oliveira's purchase in the IPO, became a legally binding contract. As the Court understands the argument, because the Prospectus stated that Quartet "may" require shareholders to satisfy a delivery requirement and warned that the Proxy would disclose whether such a requirement had been imposed, Oliveira was obligated to follow the Proxy's instructions in order to exercise his conversion rights.

Although Oliveira disputes that the Prospectus is a contract, the Court does not reach the issue because the terms of the Prospectus itself do not support defen-

dants' theory. The gist of defendants' argument is that the Prospectus defines the nature of the shares offered in the IPO and that, notwithstanding the terms of the Amended Certificate, what Oliveira was actually offered were shares with conversion rights subject to a delivery requirement that could be imposed at Quartet's discretion. The Prospectus, however, under the heading "DESCRIPTION OF SECURITIES," instructs potential investors:

> The following description summarizes all of the material terms of our securities. Because it is only a summary, it may not contain all the information that is important to you. For a complete description you should refer to our amended and restated certificate of incorporation and bylaws, which are filed as exhibits to the registration statement of which this prospectus is a part.

Thus, regardless of whether the Prospectus is a binding contractual document, it does not purport to be the controlling document defining the rights of the securities offered; instead, the Prospectus, consistent with Delaware law, *see* Del.Code tit. 8, § 151(a) (providing that, in general, all "qualifications, limitations or restrictions" on rights attendant to stock "shall be stated and expressed in the certificate of incorporation"), directs potential investors to refer to the Amended Certificate. As a result, the Court, too, looks only to the Amended Certificate to ascertain whether Oliveira properly exercised his conversion rights. *Cf. Doppelt v. Perini Corp.,* No. 01 Civ. 4398, 2002 WL 392289, at \*4 (S.D.N.Y. Mar. 13, 2002) *aff'd,* 53 Fed.Appx. 174 (2d Cir.2002) ("The Court finds that the Certificate of Vote is the controlling document in this case. The prospectus clearly states that it is only a summary of terms and that it 'does not purport to be complete and is

---

4. In contrast, the Amended Certificate does incorporate certain terms in the Registration Statement relevant to Quartet's indemnifica- tion obligations. *See* Amended Certificate at 6.

subject to, and qualified in its entirety by, the provisions of" the Certificate of Vote."); *In re Discon Corp.*, 346 F.Supp. 839, 844 (S.D.Fla.1971).

Accordingly, for the foregoing reasons, the Court grants Oliveira's motion for summary judgment and denies defendants' cross-motion for summary judgment. Within one week of the docketing of this Memorandum Order, the parties shall submit written statements, not to exceed three double-spaced pages, stating their respective views of how much prejudgment interest should be added when the Court enters final judgment, as it will, on September 30, 2015.

SO ORDERED.